UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON
CIVIL ACTION NO. 5:06-383-JBC

PRIME CONTRACTING, INC. and ) DEPOSITION TAKEN ON
COMPLETE CONTRACTING, LLC,   ) BEHALF OF DEFENDANT
                             )    BY: NOTICE
        PLAINTIFFS           )
                             )
VS.                          )
                             )
WAL-MART STORES, INC.        ) WITNESS: TONY MORTON
                             )
        DEFENDANT            ) RE: PRIME CONTRACTING

* * * * * * * *

The deposition of TONY MORTON was taken before Lisa E. Hoinke, Certified Court Reporter and Notary Public in and for the State of Kentucky at Large, at the offices of Wyatt, Tarrant & Combs, LLP located at 250 West Main Street, Suite 1600, Lexington, Kentucky, on October 23, 2007, commencing at the approximate hour of 9:40 a.m. Said deposition was taken pursuant to Notice, heretofore filed, for the purpose of discovery on behalf of the Defendant in the above-captioned action and all other purposes as permitted by the Federal Rules of Civil Procedure.

---

APPEARANCES:

HON. W. CRAIG ROBERTSON, III
HON. SHARON L. GOLD
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, Kentucky 40507-1746

COUNSEL FOR THE DEFENDANT,
WAL-MART STORES, INC.


HON. ROBERT L. ABELL
271 West Short Street, Suite 500
P.O. Box 983
Lexington, Kentucky 40588-0983

COUNSEL FOR THE PLAINTIFFS,
PRIME CONTRACTING, INC. and
COMPLETE CONTRACTING, LLC

---

I N D E X

|  | PAGE |
|---|---|
| WITNESS: TONY MORTON | |
| CROSS-EXAMINATION By Mr. Robertson | 7-268 |
| REPORTER'S CERTIFICATE | 269-270 |

* * * * * * *

E X H I B I T   I N D E X

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 14 |
| Exhibit 2 | List of jobs regarding lawsuit | 43 |
| Exhibit 3 | I-9 and instructions | 117 |
| Exhibit 4 | Subcontract Agreement for Moundsville, West Virginia Wal-Mart | 124 |
| Exhibit 5 | Subcontract Change Order for Moundsville, West Virginia Wal-Mart | 139 |
| Exhibit 6 | Letter from Cleveland Construction to Prime Contracting dated 8/23/05 | 141 |
| Exhibit 7 | Letter from Cleveland Construction to Prime Contracting dated 8/30/05 | 147 |

---

EXHIBIT INDEX -- PAGE TWO

| Number | Description | Page |
|---|---|---|
| Exhibit 8 | Deficiency Log | 150 |
| Exhibit 9 | Newspaper article regarding Moundsville illegal aliens | 152 |
| Exhibit 10 | Collection of newspaper and Internet articles | 163 |
| Exhibit 11 | Internet site regarding Stanton, Kentucky Wal-Mart | 167 |
| Exhibit 12 | I-9 form for Martin Cuevas | 169 |
| Exhibit 13 | I-9 form for Saldivar Francisco | 177 |
| Exhibit 14 | Termination letter from Cleveland Construction dated September 15, 2005 | 178 |
| Exhibit 15 | Letter to Cleveland Construction Co., Inc. from Tony Morton Dated 9/16/05 | 179 |
| Exhibit 16 | Letter from ICE to Tony Morton Dated 9/21/05 | 181 |
| Exhibit 17 | Letter from Cleveland Construction to Prime Contracting, 10/28/05 | 183 |
| Exhibit 18 | Letter from Thomas M. Todd to Cleveland Construction, 11/7/05 | 184 |
| Exhibit 19 | String of e-mails regarding the Moundsville project | 185 |
| Exhibit 20 | Subcontract Agreement for the Westchester, Ohio Wal-Mart store | 189 |
| Exhibit 21 | Subcontract Change Order for Westchester Wal-Mart | 198 |

EXHIBIT INDEX PAGE THREE

| Number | Description | Page |
|---|---|---|
| Exhibit 22 | Memorandum from Cleveland Construction to Prime Contracting Regarding Damage to Plumbing Underground Piping, dated 1/17/05 | 199 |
| Exhibit 23 | Subcontract Agreement regarding Centerville, Ohio Wal-Mart | 201 |
| Exhibit 24 | Subcontract Change Order on the Centerville, Ohio Wal-Mart | 210 |
| Exhibit 25 | Letter from Parsons & Prows to Cleveland Construction | 210 |
| Exhibit 26 | Subcontract Agreement for the Oxford, Ohio Wal-Mart | 211 |
| Exhibit 27 | Subcontract Change Order for the Oxford, Ohio Wal-Mart | 216 |
| Exhibit 28 | Fax from Jeff Barnard to Tony Morton, dated 2/24/05 | 216 |
| Exhibit 29 | Weekly Job Site Coordination Meeting | 219 |
| Exhibit 30 | Affidavit of Total Release and Certification of All Bills Paid | 220 |
| Exhibit 31 | Subcontract Agreement for the Greenwood, Mississippi Wal-Mart store | 224 |
| Exhibit 32 | Subcontract Change Order for the Greenwood, Mississippi Wal-Mart store, dated 1/29/06 | 232 |
| Exhibit 33 | Subcontract Agreement for the Florence, Kentucky Wal-Mart store | 234 |

EXHIBIT INDEX PAGE FOUR

| Number | Description | Page |
|---|---|---|
| Exhibit 34 | Subcontract Change Order for for the Florence, Kentucky Wal-Mart, dated 3/25/06 | 238 |
| Exhibit 35 | Fax from Cleveland Construction for the Florence, Kentucky Wal-Mart, dated 9/15/05 | 238 |
| Exhibit 36 | Fax from Cleveland Construction to Prime Contracting regarding Florence, Kentucky Wal-Mart Dated 9/30/05 | 240 |
| Exhibit 37 | Subcontract Agreement with J.A. Fielden | 242 |
| Exhibit 38 | Employee list | 247 |
| Exhibit 39 | Letter from Tony Morton to Wal-Mart, dated 3/13/06 | 250 |
| Exhibit 40 | Collection of I-9s of Prime Contracting | 251 |

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.

---

The witness, TONY MORTON, after first being duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

By Mr. Robertson:

Q   Can you state your full name for the record, please?
A   Tony Gene Morton.
Q   Mr. Morton, my name is Craig Robertson. I represent Wal-Mart in an action that you brought against Wal-Mart on behalf of Prime Contracting and Complete Contracting. I'm here today; I'm going to ask you some questions about what you may know concerning some of the facts and circumstances surrounding that case. If I ask you a question that you don't understand or that needs to be clarified, just let me know, I'll be glad to rephrase my question for you. Otherwise, if I ask you a question and you give me an answer, I'm going to assume that you've understood my question, and that you're answering truthfully. Fair enough?
A   Right.
Q   Have you ever given a deposition before?
A   Yes, I have.
Q   How many times?
A   Once.
Q   What were the circumstances surrounding that deposition?
A   My daughter sued Wal-Mart.
Q   Were you a witness?
A   Yes, I was.
Q   When was that case?
A   Oh, it's been approximately four or five years ago.
Q   What did she sue Wal-Mart for?
A   We bought a bicycle that was put together wrong, and she -- didn't have the brakes on it, and she wrecked, knocked her teeth out.
Q   Where was that case filed?
A   I don't know if it was ever filed. We settled out of court.
Q   But you did give a deposition?
A   Yes.
Q   Where was the Wal-Mart?
A   Winchester, Kentucky.
Q   Did she have an attorney?
A   Yes.
Q   What was the attorney's name?

```
                                attorney passed away, and his -- Willie
                                Roberts, Willie Roberts, that was the
                                attorney.
        Q       Do you remember what the settlement was?
        A       $25,000.
MR. ROBERTSON:          Well, since it's been a number of
                                years, let me just give you a
                                couple of the ground rules about
                                depositions.  Again, I'm going to
                                ask you questions, and if you
                                could verbalize your answers for
                                me with yeses and nos instead of
                                uh-huhs and huh-uhs and instead
                                of shakes of the head, it makes
                                it much easier for the transcript
                                to be read at the end of the day.
                                And secondly, it also makes the
                                transcript easier to read if you
                                and I are not talking over each
                                other.  So if you will allow me
                                to finish asking my question
                                before you start giving me an
                                answer, I'll try to allow you the
                                same courtesy and not start
```

```
                                you give me your complete answer.
WITNESS:        Okay.
        Q       Where do you live?
        A       350 Shady Acres Lane, Stanton, Kentucky.
        Q       How long have you lived there?
        A       Approximately nine years.
        Q       Where did you live prior to that?
        A       2308 Cat Creek Road, Stanton, Kentucky.
        Q       How old are you?
        A       Forty-one.
        Q       Have you lived in Stanton, Kentucky, all
                your life?
        A       Most all my life.
        Q       When you say most, when have you not lived
                in --
        A       I lived in Florida for approximately five
                months when I was 21 years old.
        Q       Other than that five months, you've lived
                in Stanton the rest of your life?
        A       Other than -- yeah, I lived in Winchester,
                Kentucky, when I was like the first grade
                for a year.
        Q       But other than those two times, you lived
                in Stanton?
```

```
        A       Yes.
        Q       Are you married?
        A       Yes.
        Q       Who are you married to?
        A       Veronica Morton.
        Q       How long have you been married?
        A       Nineteen years.
        Q       Is that your only marriage?
        A       No.
        Q       How many other marriages have you had?
        A       One.
        Q       And when was that?
        A       1985.
        Q       Who were you married to?
        A       Robin Stamper.
        Q       Robin who?
        A       Robin Stamper.
        Q       How long were you married to Robin Stamper?
        A       Three months.
        Q       Do you have any children?
        A       Two.
        Q       How old are they?
        A       Eighteen and 14.
        Q       What is the name of the 18-year-old?
        A       Crystal Paige Morton.
```

```
        Q       Where does she live?
        A       She goes to college at Morehead State
                University.  She resides there now.
        Q       What's the name of the 14-year-old?
        A       Logan Kyle Morton.
        Q       Are they children that you've had with
                Veronica?
        A       Excuse me?
        Q       Are they children that you've had with
                Veronica?
        A       Yes.
        Q       What's the extent of your educational
                background?
        A       Graduated high school.  I had approximately
                one year of college.
        Q       Where did you graduate high school?
        A       Powell County High School.
        Q       And where was your one year of college?
        A       I went one semester at Eastern Kentucky
                University and one semester at UK.
        Q       Do you have other relatives in Powell
                County?
        A       Yes.
        Q       A lot?
        A       A lot.
```

```
 1              from the counties from which
 2        the jury pool in this case may be drawn
 3        from.  Those counties would include Powell,
 4        Bath, Bourbon, Boyle, Breathitt, Clark,
 5        Fayette, Estill, Fleming, Garrard,
 6        Harrison, Jessamine, Lee, Lincoln, Madison,
 7        Menifee, Mercer, Montgomery, Nicholas,
 8        Scott, Wolfe, and Woodford Counties.
 9        Rather than go through all of your
10        relatives that may reside in those
11        counties, I'd like to ask that you provide
12        to your attorney a list of all relatives
13        that would be over the age -- that would be
14        18 years or older and within the degree of
15        a first cousin or closer, provide a list of
16        those relatives to your attorney, that he
17        could then provide to me.  Can you do that?
18   A    Yes, I can.
19   MR. ABELL:       Did you define relatives?  What
20                    did you say, first cousin or
21                    closer?
22   MR. ROBERTSON:   Yes.  Either by blood or
23                    marriage.
24   A    Yes.  Can we have a list of the counties
25        or --
```

```
 1   MR. ROBERTSON:   I'm -- I'm sure, you know, Robert, I'm sure
 2                    knows the counties that would --
 3                    from which a jury pool would be
 4                    drawn.
 5   Q    All I'm trying to do is see who your
 6        relatives are in these various counties so
 7        that when we do draw a jury pool, I can
 8        know who may be related to you.
 9   A    Okay.
10        (A COPY OF THE NOTICE OF DEPOSITION WAS
11        MARKED AS EXHIBIT 1 FOR THE PURPOSE OF
12        IDENTIFICATION, AND THE SAME IS ATTACHED
13        HERETO AND FILED HEREWITH.)
14   Q    I'm going to hand you what I've marked as
15        Exhibit 1 to your deposition.  This is the
16        Notice of Deposition.  And have you seen
17        this document before?
18   A    Yes, I have.
19   Q    And are you the designated corporate
20        representative for Prime Contracting, Inc.
21        for purposes of this deposition today?
22   A    Yes, I am.
23   Q    And are you prepared to testify about the
24        eight topics that are listed in this Notice
25        of Deposition?
```

```
 1   A    Yes, I am.
 2   Q    And you understand that your testimony
 3        today is on behalf of the company, Prime
 4        Contracting, Inc.?
 5   A    Yes.
 6   Q    How are you currently employed?
 7   A    I'm employed by Harbour Contracting.
 8   Q    What do you do for Harbour Contracting?
 9   A    Estimate.
10   Q    Where is Harbour Contracting based out of?
11   A    Based out of Stanton.
12   Q    Who owns Harbour Contracting?
13   A    Robert Horn.
14   Q    How long have you worked for them?
15   A    Approximately two months.
16   Q    What type of business is Harbour
17        Contracting in?
18   A    Construction.
19   Q    Do they specialize in any type of
20        construction?
21   A    Steel erection, masonry, demolition.
22   Q    What are your job duties as an estimator?
23   A    Estimate job projects, what the costs would
24        be and submit a bid.
25   Q    Do you have any ownership interest in
```

```
 1        Harbour Contracting?
 2   A    No, I don't.
 3   Q    What are you paid?
 4   A    Approximately $1,200 a week.
 5   Q    The jobs that Harbour Contracting does, are
 6        they located in any particular geographical
 7        area?
 8   A    Not really.
 9   Q    All over Kentucky or all over the country?
10   A    Primarily in the Southeast, but there are
11        other projects that go beyond that.
12   Q    How many employees does Harbour Contracting
13        have?
14   A    Approximately 50.
15   Q    What did you do prior to working for
16        Harbour Contracting?
17   A    I owned Complete Contracting and Prime
18        Contracting.
19   Q    Do you no longer own those companies?
20   A    Yes, I do.
21   Q    Are those companies no longer in business?
22   A    They're -- they're open but no longer
23        active.
24   Q    What do you mean by that?
25   A    Well, we don't -- we don't have any -- any
```

```
 1  Q   [any projects?]
 2  Q   And how long has it been since you haven't
 3      had any jobs or any projects for Prime or
 4      Complete?
 5  A   Prime did one job this year, I think.
 6      Complete has -- Prime and Complete, both, I
 7      think this year have -- we have had to do
 8      some warranty work for Wal-Mart.
 9  Q   Is there any particular reason why Prime
10      and Complete doesn't currently have any
11      projects?
12  A   Because due to Wal-Mart removing us from
13      projects, they struck such a financial blow
14      that we're not able to work anymore.
15  Q   Did Prime and Complete work on any other
16      projects besides Wal-Mart projects?
17  A   Yes.
18  Q   Let me start with this, when was Prime
19      Contracting formed?
20  A   I think it was 1995.
21  Q   Who formed the company?
22  A   Tony Morton, Robert Morton, and James Root.
23  Q   Is Robert Morton related to you?
24  A   He's my father.
25  Q   And who is James Root?
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    17

```
 1  A   James Root is a -- it's a guy that used to
 2      work for us that become a partner with
 3      Prime Contracting.
 4  Q   What is your experience in the construction
 5      industry?
 6  A   I've been doing construction since I was 16
 7      years old, you know, all types of
 8      construction from residential, commercial,
 9      retail, industrial.
10  Q   Let's talk about your employment history
11      and, particularly, you said you've been
12      doing construction since you were 16 years
13      old, so what was your first construction
14      job?
15  A   I worked with my father in the summer
16      laying block on houses, residential
17      projects.
18  Q   Did your father have a company?
19  A   Not really, not incorporated, just worked
20      for hisself, self-employed.
21  Q   And he specialized in laying block in
22      residential houses?
23  A   Yes, and pouring concrete.
24  Q   How long did you do that?
25  A   Well, I did that till I got out of -- till
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    18

```
 1      I was 16 ½, probably.  Then I went to work
 2      for Druthers, which is a fast food
 3      restaurant, when I was in high school.
 4  Q   Let's just talk about your construction
 5      jobs.  So what was your next construction
 6      job?
 7  A   When I was -- after the one year of
 8      college, I started working contracting work
 9      for Bullock Garages here out of Lexington,
10      Kentucky.
11  Q   For whom?
12  A   Bullock Garages.
13  Q   And what did you do for them?
14  A   Mainly poured concrete, and we also did
15      block garages, masonry garages.
16  Q   How long did you work for them?
17  A   Probably for two years, two-and-a-half
18      years.
19  Q   What was your construction job after that?
20  A   I went to Florida for about five months and
21      worked for a fellow doing concrete work in
22      Florida.
23  Q   What type of concrete work?
24  A   Mostly, residential.  We did driveways for
25      houses.
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    19

```
 1  Q   And what was the name of that company that
 2      you worked for?
 3  A   I cannot remember.
 4  Q   What was your next construction job after
 5      that?
 6  A   I went back to work with my father.  We did
 7      a lot of projects up in Michigan, churches,
 8      pouring concrete.
 9  Q   More concrete work?
10  A   More con -- yeah, yes.
11  Q   How long did you do that for?
12  A   Approximately two years.
13  Q   Then what did you do?
14  A   We started working out of Lexington,
15      Kentucky contracting and formed Morton
16      Masonry.
17  Q   Who formed Morton Masonry?
18  A   My father and I.
19  Q   What did Morton Masonry do?
20  A   Did various schools, retail, poured
21      concrete, laid block, masonry.
22  Q   Approximately when was Morton Masonry
23      formed?
24  A   Probably about 1991, somewhere.
25  Q   Is Morton Masonry still in business?
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    20

```
 2   Q   When did it go out of business?
 3   A   1995.
 4   Q   Why did it go out of business?
 5   A   We took on a partner, James Root, and
 6       formed a new company, Prime Contracting.
 7   Q   And how did Prime Contracting differ from
 8       Morton Masonry?
 9   A   It really didn't other than we had -- we
10       just took on a new partner and thought we'd
11       just form a new company.
12   Q   And what was the reasoning behind that?
13   A   I cannot even remember.
14   Q   And so since 1995, you've been involved in
15       Prime Contracting?
16   A   Yes.
17   Q   And what is Prime Contracting's line of
18       work?
19   A   Masonry, and steel erection.
20   Q   And how would you explain to a lay person
21       what the term, I'm involved in masonry,
22       means?
23   A   Well, we would lay up buildings, mostly
24       retail.  You know, you start at the
25       foundation and lay walls and pour grout in
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    21

```
 1       them and get them ready for the steel, to
 2       hang steel on.
 3   Q   And what about steel erection, what
 4       specifically did you do?
 5   A   Steel erection, you're going to put up
 6       columns, girders, bar joists and deck it,
 7       get ready for roof.
 8   Q   And as of today, Prime Contracting is still
 9       a viable entity?
10   A   It's still open.
11   Q   Just not doing any work?
12   A   Not doing any work.
13   Q   When Prime Contracting was first formed in
14       1995, who did you do work for?
15   A   We worked for J.A. Fielden, Shannon,
16       Strobel and Weaver, maybe Hudson
17       Construction, mainly doing Wal-Marts.
18   Q   You started doing Wal-Marts back in as
19       early as 1995?
20   A   1995.
21   Q   And was the construction of Wal-Marts the
22       primary work that Prime Contracting did?
23   A   Probably 80 percent.
24   Q   And what would the other 20 percent consist
25       of?
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    22

```
 1   A   Retail buildings, shops that were mainly
 2       built beside Wal-Marts.
 3   Q   For anybody in particular or just --
 4   A   Usually the same general contractor we were
 5       doing the Wal-Mart for, J.A. Fielden,
 6       Hudson Construction, Shannon, Strobel,
 7       Weaver.
 8   Q   Did you work for any other general
 9       contractors?
10   A   Oh, yes, Charles Van Zandt, Gilliam &
11       Associates, M&W Builders, Tri-C
12       Construction, T.D. Farrell.  I could
13       probably go on with a list of 20 more if I
14       could think of them all.
15   Q   And those general contractors, were they
16       also constructing Wal-Marts?
17   A   Yes.
18   Q   Who were the -- well, let me start with
19       this, currently who are the officers of
20       Prime Contracting, Inc.?
21   A   The officers are Robert Morton and Tony
22       Morton and Louise Morton.
23   Q   Who is Louise Morton?
24   A   My mother.
25   Q   What specific office or positions do each
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    23

```
 1       of those individuals hold?
 2   A   Tony -- I am president; Robert Morton is
 3       vice president; Louise is secretary.
 4   Q   Has that always been the case?
 5   A   Yes.
 6   Q   You've always been the president?
 7   A   Yes.
 8   Q   From 1995 to present -- to current?
 9   A   Yes.
10   Q   And Robert Morton, your father, has been
11       vice president from '95 to present?
12   A   Yes.
13   Q   Was James Root initially the secretary?
14   A   He may have been.  I can't remember.
15   Q   Or do you think, was Louise Morton
16       always -- has she always been the
17       secretary?
18   A   I think she has.  I mean, I could be wrong,
19       but I think she has.
20   Q   Who's responsible for keeping the corporate
21       records?
22   A   That's me.
23   Q   Where do you keep those?
24   A   In my office at 118 West Collins Avenue.
25   Q   Is that the office for Prime Contracting?
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    24

### Page 25

```
 2  Q    What percentage of Prime Contracting do you
 3       own?
 4  A    I own 50 percent.
 5  Q    Who owns the other 50 percent?
 6  A    Robert Morton.
 7  Q    Has that always been the case?
 8  A    No.  James Root at one time owned 33
 9       percent.
10  Q    Have you always owned 50 percent?
11  A    No.  I owned 33 percent.
12  Q    At one point, did each of you, Robert, and
13       James own 33 percent?
14  A    Yes.
15  Q    And then subsequently, that changed to
16       where just you and Robert owned 50 percent?
17  A    Yes.
18  Q    When did that change?
19  A    I think 1997, approximately.
20  Q    What caused James Root to no longer be
21       involved in the company?
22  A    He had marital problems.
23  Q    And has he been involved with Prime
24       Contracting since 1997?
25  A    Yes.
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    25

### Page 26

```
 1  Q    What does he do?
 2  A    Superintendent.
 3  Q    So he no longer owns a part of the company;
 4       he just is an employee?
 5  A    Yes.
 6  Q    Is he still an employee?
 7  A    No.
 8  Q    When did he cease to be an employee?
 9  A    Right after we were removed from Wal-Marts
10       in, I'm going to say, in 2005.
11  Q    November of 2005?
12  A    I do not know if that is the month.
13  Q    Well, when you say that you were removed
14       from Wal-Mart, was there a particular event
15       that you remember that constituted the
16       removal by Wal-Mart?
17  A    Yeah.  We -- well, Wal-Mart had sent out
18       letters asking where we were working, and
19       then they sent a letter to all the
20       contractors -- they didn't send a letter to
21       Prime Contracting; they sent a letter to
22       the contractors, told them to remove us
23       from the projects.
24  Q    Does Prime Contracting currently have any
25       employees?
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    26

### Page 27

```
 1  A    No, it does not.
 2  Q    Has Prime Contracting had any employees
 3       since these letters went out that you just
 4       discussed?
 5  A    Yes for probably, maybe, a short while
 6       after, maybe a month, something like that.
 7  Q    After that month, then has Prime
 8       Contracting not had any employees since
 9       then?
10  A    No.
11  Q    So your testimony is that approximately a
12       month after these letters went out from
13       Wal-Mart, since that time, Prime
14       Contracting has had no employees?
15  A    Approximately, yes.
16  Q    Who has done -- I think you said that Prime
17       Contracting had one job in 2007.  Who did
18       that job in terms of performing the work?
19  A    We -- I hired Harbour Contracting to
20       perform it.
21  Q    So Prime Contracting just subcontracted
22       that job out?
23  A    Yes.
24  Q    And I think you also mentioned that some
25       warranty work had been done for Wal-Mart.
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    27

### Page 28

```
 1       How did Prime Contracting get that job,
 2       that work done?
 3  A    Subbed it out to Harbour Contracting.
 4  Q    Did Prime Contracting file tax returns for
 5       each year from 1995 to present?
 6  A    Yes.
 7  Q    Who prepared those tax returns?
 8  A    Probably the first -- Ron Small, and then
 9       some -- someone else that -- that had
10       bought Ron Small's accounting agency, and
11       then it was a Uebelhor was his last name.
12       He bought those people out, and then it was
13       -- our accountant now is -- Brian Uebelhor
14       was his name, and our accountant now is
15       Stuart Goldsborough or Goldsburg, Stuart
16       Goldsburg.
17  Q    Ron Small was initially Prime Contracting's
18       accountant?
19  A    Yes.
20  Q    Where was he located?
21  A    Estill County, Irvine, Kentucky.
22  Q    Did he have a business or was he just in
23       business for himself?
24  A    In busi -- Ron Small, I think his name was
25       Ron Small & Associates.
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    28

## Page 29

```
 1              company - - or another her, - - 
 2              company bought them out?
 3   A          No.  No.  Two ladies out of Richmond, but I
 4              cannot remember their name.
 5   Q          Two ladies out of Richmond bought the Ron
 6              Small & Associates Company out?
 7   A          Yes.
 8   Q          And then they did Prime Contracting's taxes
 9              --
10   A          For one year.
11   Q          You don't remember their name?
12   A          No, I do not.
13   Q          Do you remember the name of their company?
14   A          No.
15   Q          Then somebody bought out the two ladies?
16   A          Yes, Brian Uebelhor.
17   Q          And what was -- did he -- was he called
18              Brian Uebelhor --
19   A          Yes.  Yeah.  He didn't -- that's all I know
20              him as, Brian Uebelhor.
21   Q          And then did Mr. Goldsburg buy out
22              Mr. Uebelhor?
23   A          No.  Brian Uebelhor had marital problems,
24              and basically, just quit doing CPA, quit
25              being a CPA, and Stuart Goldsborough or
```

## Page 30

```
 1              Goldsburg -- I don't know for anyone, and so
 2              he just -- you know, I contacted him, and
 3              he took over our...
 4   Q          And he's doing it currently?
 5   A          Yes.
 6   Q          Where is he located?
 7   A          He's located here in Lexington.
 8   Q          Does he work for a firm or on his own?
 9   A          No.  No.  Just a CPA.
10   Q          Do you have copies of all the tax returns
11              for Prime Contracting from '95 to present?
12   A          Yes.
13   Q          And you keep those in your office?
14   A          Yes.  I keep a copy in my office.
15   Q          Where is Prime Contracting licensed to do
16              business?
17   A          Licensed to do business?
18   MR. ROBERTSON:      Yes.
19   A          I would say the only license that we hold
20              now would be Louisiana.  We were licensed
21              in more states than that, but we
22              relinquished those licenses.
23   Q          What states was Prime Contracting licensed
24              in?
25   A          Mississippi, Louisiana, Virginia, West
```

## Page 31

```
 1              Virginia, either North or South Carolina,
 2              one of those two.  A lot of states you do
 3              not have to be licensed in to do masonry or
 4              steel erections.
 5   Q          Do you still have records of all the states
 6              that Prime Contracting was licensed to do
 7              business in?
 8   A          I'm sure I do.
 9   Q          But some states you don't need a license to
10              do masonry and --
11   A          Some states you don't need a license.
12   Q          What is your understanding of the laws
13              pertaining to the hiring of workers who are
14              not citizens of the United States?
15   A          Who are not citizens?
16   MR. ROBERTSON:      Correct.
17   A          You treat them like anyone else; they fill
18              out an I-9 and a W-4.
19   Q          And do you have any understanding as to
20              whether or not or what qualifies
21              individuals for being able to work?
22   A          Well, your documentation on your I-9 form.
23   Q          Do you have any understanding of what
24              documentation is required?
25   A          Well, there's an A, B, and C, I think, on
```

## Page 32

```
 1              the I-9 form.  And if you have, I think,
 2              it's the A column, if you have one of those
 3              forms, then you don't have to have B and C,
 4              but if you don't have an A, you have to
 5              have B and C.
 6   Q          What was the most number of employees that
 7              Prime Contracting had at any time from '95
 8              to present?
 9   A          The most?  I mean, it's a guess, but I want
10              to say 15.
11   Q          And do you have records as to who those 15
12              individuals would have been?
13   A          I don't know if we have records going back.
14              I mean, we have records.  Do we have
15              records of all 15 of those or -- you know,
16              I don't know.  I mean, we have the records
17              we're -- we're supposed to keep, you know.
18   Q          You have some records that would indicate
19              who the employees would have been for Prime
20              Contracting?
21   A          Yes.
22   Q          You just don't know how far back they go;
23              is that what you're telling me?
24   A          Yes.  Because some records, you know, you
25              -- you can purge at certain dates.  I think
```

**Page 33**

```
 2            you have to keep them after an employee is
 3            gone.
 4   Q        What types of employees did Prime
 5            Contracting have?
 6   A        What types?
 7   MR. ROBERTSON:    Right.
 8   A        I'm not understanding.
 9   Q        In terms of were the employees of Prime
10            Contracting all manual laborers,
11            construction, or did you have office help
12            or --
13   A        Yes. We had office help; we had
14            superintendents. We mainly had office help
15            and superintendents, and then we had a few
16            laborers, what we would call laborers, yes.
17   Q        What records did you keep on your
18            employees?
19   A        What records?
20   MR. ROBERTSON:    Yes.
21   A        We kept a W-4 form and I-9.
22   Q        Anything else?
23   A        Not that comes to mind.
24   Q        When Prime Contracting would hire someone,
25            did you require that person to fill out an
```

**Page 34**

```
 2   A        Not necessarily an application if he was
 3            hired on the job. But all they -- what
 4            they were required to do was an I-9 and a
 5            W-4. Now they -- now some did fill out an
 6            application, say, if they come and applied
 7            for a job, but a lot -- some of those
 8            employees if you hired a laborer, a day
 9            laborer, you know, you, maybe, hired on the
10            project and didn't have an application.
11   Q        But for everyone that you hired, you would
12            have an I-9 and a W-4?
13   A        Yes.
14   Q        And do you still have those I-9s and W-4s
15            for all of Prime Contracting employees?
16   A        We have -- I'm sure we have them if, you
17            know, if we were supposed to keep them, if
18            the dates...
19   Q        What's your understanding of what records
20            you're supposed to keep?
21   A        Well, I can't remember an exact date, but
22            an I-9 you had to keep for so long a time.
23            As long as they're employed, you would keep
24            it, but after he's employed, I think it may
25            be one year after they're, you know, after
```

**Page 35**

```
 1            they're no longer employed.
 2   Q        Does Prime Contracting have any specific
 3            policy about record retention?
 4   A        We just, you know, ever what state and
 5            federal regulations are.
 6   Q        Do you know what those state and federal
 7            regulations --
 8   A        Well, I think an I-9, you know, like I
 9            said, as long as he's employed, you have to
10            keep an I-9 and a, you know, a W-4, and I
11            think it's one year after they're no longer
12            employed that you -- you do not have to
13            retain it.
14   Q        Does Prime Contracting currently in its
15            records have any I-9s and W-4s from its
16            former employees?
17   A        I would think we do. Yes, I would assume
18            we have.
19   Q        Was Prime Contracting at any time from 1995
20            to present ever investigated by any local,
21            state or federal agency regarding the
22            hiring of illegal aliens?
23   A        Prime Contracting?
24   MR. ROBERTSON:    Yes.
25   A        Prime, no.
```

**Page 36**

```
 1   Q        Does Prime Contracting currently have any
 2            assets?
 3   A        Very -- not -- may have very little,
 4            monetarily-wise anyway.
 5   Q        What would that consist of?
 6   A        Well, the assets, I would assume, would be
 7            money. I'm counting it as accounts
 8            receivable as money owed. What we say is
 9            owed anyway.
10   Q        Sure. What about equipment?
11   A        Nothing that's worth anything. There's
12            some old -- probably still have some old
13            forklifts that are -- they're not
14            worthless, I don't guess, but they're not
15            worth much.
16   Q        Property?
17   A        No property.
18   Q        At any point did Prime Contracting ever own
19            any property?
20   A        No. It never owned any property.
21   Q        What about equipment, did Prime Contracting
22            ever own anything --
23   A        Yes.
24   Q        -- besides forklifts?
25   A        Well, yeah, pickup trucks.
```

**Page 37**

2   A   Mortar machines, you know, equipment to do
3       the projects with, mortar machines,
4       scaffolds.
5   Q   Does Prime Contracting not still own
6       those --
7   A   Yes. Yes. It still has some old
8       scaffolding, yes.
9   Q   What about the mortar machines --
10  A   Yes.
11  Q   That, too?
12  A   Yes.
13  Q   So the equipment that Prime Contracting
14      owned, Prime Contracting still has it; it
15      hasn't sold it?
16  A   No, have not sold it.
17  Q   Did Prime Contracting have any policies or
18      procedures for hiring workers?
19  A   Not other than your forms, your -- you
20      know, you had to fill out an I-9 and a W9
21      or W-4, I'm sorry. I didn't -- go ahead.
22      That's it.
23  Q   So other than that, there were no policies
24      or procedures?
25  A   Not other than safety. Some safety, you

**Page 38**

2   Q   Did Prime Contracting ever have a safety
3       manual?
4   A   Yes.
5   Q   Was that something that you gave every
6       employee?
7   A   No. We did not give it to every employee.
8       We had safety talks, weekly safety talks on
9       the projects.
10  Q   Was the safety manual given to any
11      employee?
12  A   No.
13  Q   Was the safety manual just for your
14      benefit?
15  A   No. The safety manual, we kept on the
16      project. We gave a copy to the general
17      contractor. We kept copies in the office,
18      and we had CDs and tests that an employee
19      would -- a CD that he would watch, I think,
20      and then a test that he would take
21      afterwards.
22  Q   Was there a certain grade that the employee
23      would have to get on the test?
24  A   I'm sure he would have to pass the test.
25  Q   Do you keep records of those tests that you

**Page 39**

1       administer to your employees?
2   A   We did. I don't know if we -- I don't know
3       if we still have that, but we did.
4   Q   I think previously in one of your answers,
5       you mentioned that some employees of Prime
6       Contracting were hired as day laborers; did
7       I understand you correctly?
8   A   Every once in a while, maybe.
9   Q   What did you mean by the term, day laborer?
10  A   Well, I shouldn't have probably said day
11      laborers. I mean, we may hire labor to
12      help clean up on a project or something.
13  Q   In other words, you would just hire
14      somebody sort of on the spot to help --
15  A   Yes.
16  Q   -- with a particular task on the job?
17  A   Yes.
18  Q   And for that individual, you would have
19      them fill out an I-9 and a W-4 before they
20      would work?
21  A   Yes. It would be faxed in our office.
22  Q   Would you hire -- and I'll just refer to
23      those folks as day laborers, use that
24      term, would you hire day laborers for
25      anything other than just cleaning up on the

**Page 40**

1       job?
2   A   No. And we did very little of that.
3   Q   So you wouldn't hire any day laborers to do
4       masonry work?
5   A   No.
6   Q   Or to do steel erection work?
7   A   Yeah. On steel erection, maybe, yes.
8   Q   And where would you find these day laborers
9       to do this work?
10  A   Well, they come to the project.
11  Q   They just show up on the project?
12  A   Yeah, looking for a job.
13  Q   And who would have the authority on the
14      projects to hire them?
15  A   Superintendent.
16  Q   Did the superintendent need to clear that
17      with you or did the superintendent have the
18      authority to do that themselves?
19  A   No. They would usually call me.
20  Q   How many superintendents did Prime
21      Contracting have?
22  A   I don't know, just a couple.
23  Q   Who were the superintendents?
24  A   James Root. I don't know, he may have been
25      the only one we had, really, as far as

**Page 41**

```
 1              Javier Alvarez.
 2   Q    Mr. Root, do you know where he currently
 3        resides?
 4   A    London, Kentucky.
 5   Q    Do you have an address for him?
 6   A    I do, but not with me, but yes, I have an
 7        address.
 8   Q    Do you have a phone number for him?
 9   A    I have his cell phone.
10   Q    What about Javier Alvarez, where does he
11        reside?
12   A    Cynthiana, Kentucky.
13   Q    Do you have an address for him?
14   A    No, not unless it's still in the records.
15        If we still have his I-9 and W-4, we would
16        have that.
17   Q    Do you have a phone number for him?
18   A    No.
19   Q    So Mr. Root and Mr. Alvarez would typically
20        contact you if they wanted to hire a day
21        laborer but not always?
22   A    No, they -- they would contact me.
23   Q    Every time they had to --
24   A    Yes.
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.      41

**Page 42**

```
 1   A    Yeah, they would run it by me first.
 2   Q    And why?
 3   A    Well, just to make sure that we needed one,
 4        and to, you know, alert me, and usually
 5        we'd have to fax them over, if they didn't
 6        have a copy of, you know, of the paperwork.
 7   Q    Where would Prime Contracting get the other
 8        employees that would work on a particular
 9        job?
10   A    We sub our work out, subcontractors.
11   Q    Did Prime Contracting do any of the work
12        itself?
13   A    We did a little, very little.  We mostly
14        did like finish some project up or, you
15        know, or cleanup or something, but we -- we
16        tried to sub it out 100 percent if we
17        could.
18   Q    And on the Wal-Mart projects, is that what
19        Prime Contracting did?
20   A    Yes.
21   Q    On any of the Wal-Mart projects that are at
22        issue in this case, did Prime Contracting
23        do any of the work itself?
24   A    No.  It was subbed out.
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.      42

**Page 43**

```
 1   Q    All of it?
 2   A    Yes.  But like I said, we, you know, they
 3        -- even though they might have a contract,
 4        if they couldn't get back to do some
 5        cleanup or, maybe, finish some
 6        miscellaneous items, we would do it for
 7        them, then take that out of their contract.
 8   Q    But as far as the main substance of the
 9        masonry and steel erection work, all that
10        was subbed out?
11   A    It was all subbed out, yes.
12        (A COPY OF THE LIST OF JOBS REGARDING THIS
13        LAWSUIT AS EXHIBIT 1 FOR THE PURPOSE OF
14        IDENTIFICATION, AND THE SAME IS ATTACHED
15        HERETO AND FILED HEREWITH.)
16   Q    I'm going to hand you what we've marked as
17        Exhibit 2, and I will just represent to you
18        that this was a chart that I have created
19        which I believe lists all of the jobs that
20        are at issue in this case, and I will tell
21        you that I've gotten this list from your
22        Complaint and your discovery answers.  If
23        you could review this, and I'd like for you
24        to be able to confirm for me that these
25        are -- this is a complete and accurate list
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.      43

**Page 44**

```
 1        of the job sites that are at issue in this
 2        lawsuit?
 3   A    Okay.
 4        (WITNESS REVIEWS DOCUMENT)
 5   A    It appears to be.  There may be one project
 6        in Tennessee that we actually had a
 7        contract on that we did not do due to the
 8        fact that they had removed us from
 9        projects.
10   Q    Do you remember anything about that project
11        in Tennessee?
12   A    Well, we were -- we had a contract on it
13        with M&W Builders, but we did not -- when I
14        contacted them and said, hey, we've been
15        removed from other Wal-Mart projects, and I
16        kind of asked them what do you want us to
17        do, and they called Wal-Mart.  And then
18        when they got back with me, they said, do
19        not -- do not come to do this project.
20   Q    Where was that job located?
21   A    It was in Tennessde.  I cannot -- it was
22        somewhere around Nashville, but I do not
23        have the name.
24   Q    I guess my question to you is, is whether
25        or not you're asserting in this case that
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.      44

```
 1                    particular job?
 2  A    I can't say that I was terminated. I was
 3       just told that I probably -- that I should
 4       not come do it.
 5  Q    Are you -- let me ask you this, was that
 6       contract with Prime Contracting or
 7       Complete?
 8  A    Complete Contracting.
 9  Q    Are you alleging in this lawsuit that
10       you've been damaged because of that
11       particular job?
12  A    Well, we lost profits that we -- we could
13       have gained. We had -- we had -- we had,
14       you know, went through the bidding through.
15       We had lined up vendors. We were ready to
16       start that project, but you know, once I
17       made the phone call to M&W -- contacted M&W
18       Builders, they contacted Wal-Mart, they got
19       back with me and said, do not -- do not,
20       you know, come to this job.
21  Q    Is there any particular reason why that job
22       was not previously raised in any of the
23       pleadings or your discovery answers?
24  A    We had forgot. We had just forgotten about
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    45

```
 1       [that lawsuit we referred to] from [...]
 2  Q    Are you now wanting to make it a part of
 3       this lawsuit, is my question?
 4  A    Yes.
 5  MR. ROBERTSON:    Make a note of that. And Robert,
 6       I'll be asking for all
 7       documentation related to that
 8       project because I don't think we
 9       have any.
10  Q    Aside from that one project in Tennessee,
11       do you believe this to be an accurate list
12       of all the jobs and projects at issue in
13       this litigation?
14  A    Other than what I would say was future
15       projects, I assume we are asserting that,
16       you know, we were damaged as far as future
17       projects, yes.
18  Q    On all of these projects on the list that
19       you're looking at, Prime Contracting
20       subcontracted the work out?
21  A    Yes.
22  Q    And when Prime Contracting did that, did
23       Prime Contracting have a written contract
24       with the entity with whom it subbed the
25       work out?
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    46

```
 1  A    I would assume we had a written contract,
 2       yes.
 3  Q    And do you still have records of those
 4       written contracts?
 5  A    I would assume we do, yes.
 6  Q    You say that you assume. Do you know for
 7       sure or not?
 8  A    Well, I can't say 100 percent for sure.
 9  Q    But what you're telling me is that it would
10       be typical business practice of Prime
11       Contracting --
12  A    Yes.
13  Q    -- to have a written contract with a
14       subcontractor?
15  A    Yes. Yes.
16  Q    Was the subcontractor that Prime
17       Contracting subbed the work out to, was it
18       always the same on different -- on all
19       these jobs or was it a different
20       subcontractor?
21  A    We had numerous subcontractors, but they
22       did follow us around, and we kept them,
23       what I would consider busy; we kept them
24       projects to go to.
25  Q    Do you know off the top of your head, can
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    47

```
 1       you tell me any of the subcontractors on
 2       these jobs that Prime Contracting
 3       subcontracted work out to?
 4  A    I can tell you who they are. I can't tell
 5       you -- I can't put them to a certain
 6       project, but I can tell you who they are.
 7  Q    Who are they?
 8  A    Rocky Rowland, Brian Morton, Jerry Morton,
 9       Eric Everman. I'm trying to think what
10       this guy in South Carolina, what he called
11       his... There's a couple more, but I
12       just -- I can't remember what their names
13       are right now. I know there's more than
14       that.
15  Q    Who is Rocky Rowland?
16  A    Rocky Rowland. Rocky Rowland, I mean, he
17       -- a guy that's worked -- he did work for
18       us.
19  Q    Does he have his own company?
20  A    Yes.
21  Q    What's the name of his company?
22  A    Rocky Rowland. He didn't have a name, per
23       se, just Rocky Rowland, doing business as
24       Rocky Rowland, I assume.
25  Q    Where is he located?
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    48

dd
Case: 5:06-cv-00383-JBC-JBT Doc #: 24 Filed: 04/07/08 Page: 13 of 15 - Page ID#: 592

### Page 49

| | | |
|---|---|---|
| 2 | Q | And so Rocky Rowland, doing business as Rocky Rowland, is one of the entities or people that you subcontracted work out to? |
| 5 | A | Yes. |
| 6 | Q | Who were his employees; do you know? |
| 7 | A | I cannot tell you. |
| 8 | Q | And he's located in Stanton, Kentucky? |
| 9 | A | Uh-huh (AFFIRMATIVE). |
| 10 | Q | Yes? |
| 11 | A | Yes. I'm sorry. |
| 12 | Q | And did you have written contracts with Rocky Rowland? |
| 14 | A | Yes. |
| 15 | Q | How long have you known Rocky Rowland? |
| 16 | A | I've known Rocky Rowland for approximately 19 years. |
| 18 | Q | What type of work did Rocky Rowland do for you? |
| 20 | A | Masonry. |
| 21 | Q | Did he do any steel erection? |
| 22 | A | I do not believe so. |
| 23 | Q | Do you know what Rocky Rowland's construction experience is? |
| 25 | A | Oh, he had many, many years in masonry |

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.   49

### Page 50

| | | |
|---|---|---|
| 2 | Q | Do you know any of the particulars of it? |
| 3 | A | Well, I don't -- you know, he did masonry, was a superintendent for masonry work, in the union, you know, was a very competent mason. |
| 7 | Q | Has he always worked for himself? Did he work for other companies? |
| 9 | A | No. He worked for -- he worked me, Morton Masonry, before he worked -- before he subbed off of us. But he worked for various, I mean, numerous people. Worked for himself before he came -- you know, also. |
| 15 | Q | Why was it that Prime Contracting subcontracted the work out on these Wal-Mart projects? |
| 18 | A | Because it was much -- where they were in -- where they were scattered so far away, it was much easier, and a lot cleaner for us if we -- if we took a project, had so much money in it, and then subbed it out to -- subbed the labor out to a -- to a guy. That way we didn't have to have a superintendent other than, maybe, a general |

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.   50

### Page 51

| | | |
|---|---|---|
| 1 | | superintendent to check on them, and it just made economical sense for us. |
| 3 | Q | Were the general contractors aware that you were subcontracting the work out? |
| 5 | A | Oh, yes. |
| 6 | Q | All of them? |
| 7 | A | I would assume all of them. We didn't -- we didn't hide it. |
| 9 | Q | Was Wal-Mart aware of the fact? |
| 10 | A | Wal-Mart, I can't tell you. I never -- I -- we didn't converse with Wal-Mart. |
| 12 | Q | Brian Morton is another individual that you subcontracted work out to? |
| 14 | A | Yes. |
| 15 | Q | And does he have a company? |
| 16 | A | Yes. I think it's Brian Morton. He may have had a name. I don't remember. |
| 18 | Q | Do you think that it was similar to Rocky Rowland, in other words, Brian Morton, doing business as Brian Morton? |
| 21 | A | Yeah. He may have had a name, initial or something, but I cannot tell you at this time what it was. |
| 24 | Q | Do you believe that you had written contracts with Brian Morton? |

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.   51

### Page 52

| | | |
|---|---|---|
| 1 | A | I'm sure we had some, yes. |
| 2 | Q | Is he related -- |
| 3 | A | He's my brother. |
| 4 | Q | Does he live in Stanton, Kentucky? |
| 5 | A | Yes. |
| 6 | Q | Do you have addresses for Brian Morton and Rocky Morton? |
| 8 | A | I would assume I do, yes. |
| 9 | Q | How old is your brother? |
| 10 | A | Thirty. |
| 11 | Q | And what type of work did Brian Morton do for you? |
| 13 | A | Masonry construction. |
| 14 | Q | Any steel erection? |
| 15 | A | I don't think so. |
| 16 | Q | Do you know who Brian Morton's employees were? |
| 18 | A | No, I do not. |
| 19 | Q | Who's Jerry Morton? |
| 20 | A | Jerry Morton is my uncle. |
| 21 | Q | Did he have a company or did he also just do business as Jerry Morton? |
| 23 | A | I think it was just Jerry Morton, doing busi -- yeah. |
| 25 | Q | And Jerry Morton was an individual that you |

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.   52

```
 1              projects?
 2      A       Yes.
 3      Q       Did you have written contracts with him?
 4      A       I'm sure we did.  Did we always?  I don't
 5              know that we always wrote him up, you know,
 6              but yeah, I assume we had some.
 7      Q       How old is he?
 8      A       Jerry, 52, approximately, something, early
 9              50s.
10      Q       What type of work did Jerry Morton do for
11              you?
12      A       Masonry.
13      Q       Do you know who Jerry Morton's employees
14              were?
15      A       No.  I mean, I know some names because I
16              spoke with them, but I don't -- I can't,
17              you know, I may know them by their
18              nickname, you know.
19      Q       Would it be fair to say that on these
20              Wal-Mart job sites that you don't know who
21              your subcontractors had out working on the
22              sites?
23      A       No.  I mean, that was -- they're -- you
24              know, we contracted them to do the project,
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    53

```
 1              to oversee their employees?
 2      Q       So you don't know what employees they had
 3              out on the sites working for them?
 4      A       No.
 5      Q       Did Prime Contracting ever go to the job
 6              sites?
 7      A       I did.  I did.  Robert Horn, he -- Robert
 8              Horn was superintendent for me.  Robert
 9              Horn did.  I did.  My father did some.
10              James Root.
11      Q       What about Mr. Alvarez?
12      A       Yes, he went.
13      Q       How often typically would someone from
14              Prime go to the job sites?
15      A       Oh, we were there quite often, you know, no
16              job went by that we didn't go to, probably.
17              Well, there were probably some that we
18              didn't go to, yes.
19      Q       There would have been some job sites that
20              you did not go to?
21      A       Yes.
22      Q       Just left it all completely up to the
23              subcontractors?
24      A       Yes.
25      Q       Do you remember which job sites those were?
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    54

```
 1      A       No.
 2      Q       Is there any way that you could be able to
 3              tell me which job sites Prime Contracting
 4              went to and which ones they didn't?
 5      A       No.  I could not.  No, I couldn't.
 6      Q       Prime Contracting didn't keep records of
 7              site visits, anything like that?
 8      A       No.
 9      Q       On the job sites that Prime Contracting did
10              go to, how often would you go?
11      A       Well, we might go and stay, you know, maybe
12              one of our subs had a death in the family,
13              you know, something like that, we may be
14              there for a week; we may be there, you
15              know, just various amounts of time.
16      Q       What was the purpose of Prime Contracting
17              going to the job sites?
18      A       Well, we would have to oversee, and a lot
19              of it was, you know, we might have to go
20              and cleanup or we might -- or like Javier
21              Alvarez, go finish a job or, you know, do
22              miscellaneous, or you know, we just had to
23              make sure -- we, you know, we had the
24              contract with the general, so ultimately
25              were responsible for getting that job done.
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.    55

**Page 56**

```
 1      so the will be there to get it done.
 2      If our sub, you know, say if Rocky Rowland,
 3      if he finished a job, went to another job,
 4      and it was three states away, if he could
 5      not get back, then we may go and, you know,
 6      finish up some miscellaneous stuff or
 7      something.
 8  Q   And Prime Contracting was ultimately
 9      responsible for the work that was performed
10      by the subcontractors?
11  A   Yes.
12  Q   Would it be fair to say that typically
13      Prime Contracting would not go to the job
14      site unless there was some particular
15      reason for you to?
16  A   Right.  We subbed it out, so you know, if,
17      you know, the best case scenario, we didn't
18      have to go.
19  Q   Prime Contracting would only go if there
20      was some problem, and you were needed there
21      or to clean up something or finish
22      something at the end of the project?
23  A   Well, maybe -- I can't say that it would
24      necessarily be at the end of a project, but
25      maybe in the middle before -- because these
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.      56

**Page 57**

```
 1      projects sometimes, especially, say, on an
 2      addition, you may go and do one-third of
 3      the project, leave for a month, come back,
 4      maybe do just a day's work, leave, come
 5      back, you know.
 6  Q   But Prime Contracting wouldn't go there
 7      unless there was some particular reason for
 8      you to be there?
 9  A   Well, we wouldn't just show up, no.
10  Q   You mentioned Robert Horn as one of your
11      superintendents, and I don't think you
12      mentioned him before.  Where is he
13      currently located?
14  A   In Stanton, Kentucky.
15  Q   And do you have an address and phone number
16      for Mr. Horn?
17  A   174 Lower Hatcher Creek Road.  His phone
18      number is -- his cell phone is
19      606-481-4595.
20  Q   Do you know how he's currently employed?
21  A   He owns Harbour Contracting.
22  Q   Do you know how Mr. Root is currently
23      employed?
24  A   He works for Harbour Contracting.
25  Q   What about Mr. Alvarez?
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.      57

**Page 58**

```
 1  A   I do not know.
 2  Q   When Prime Contracting would go to a job
 3      site, would anybody go besides either you,
 4      your father, Mr. Root, Mr. Horn, and
 5      Mr. Alvarez?
 6  A   Say again now?
 7  Q   When Prime Contracting would go to one of
 8      these Wal-Mart job sites, would anybody go
 9      to those job sites besides either you, your
10      father, Mr. Root, Mr. Alvarez or Mr. Horn?
11  A   Our subcontractors would go, and then, you
12      know, if it was necessary, we would -- one
13      -- one of those people would go.
14  Q   I know that your subcontractors would go.
15  A   Yeah.
16  Q   I'm just talking about Prime Contracting
17      employees.  Would you ever send any of your
18      employees to a job site besides the
19      superintendents that you've already
20      mentioned?
21  A   Yes.
22  Q   And what would be the occasion for that?
23  A   To finish a job, maybe to start a job,
24      maybe -- I don't know, to facilitate a job,
25      we may, you know, maybe I had two or three
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.      58

**Page 59**

```
 1      that if -- if they were behind, we may
 2      send, you know, to catch them up.
 3  Q   So Prime Contracting, on occasion, would
 4      send manual laborers on the job to do
 5      things?
 6  A   Yes.
 7  Q   Does Prime Contracting keep records about
 8      what employees are sent to what particular
 9      job?
10  A   No.  No.
11  Q   You have no time records or anything of
12      that?
13  A   No.  No.  We didn't keep records of which
14      job was what.
15  Q   How were your employees paid?
16  A   Ours was paid with a check.
17  Q   Were they paid hourly?
18  A   Yes, hour -- well, no, some of them were on
19      salary.
20  Q   How did you distinguish between who was on
21      salary and who was hourly?
22  A   Well, James Root was on salary; Robert Horn
23      was on salary.  I think everybody else was
24      on an hourly rate.
25  Q   And who kept records of what hours those
```

LISA E. HOINKE, CERTIFIED COURT REPORTER
AN/DOR REPORTING & VIDEO TECHNOLOGIES, INC.      59