**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CIVIL ACTION NO. 06-383-JBC**

**PRIME CONTRACTING, INC., and**
**COMPLETE CONTRACTING, LLC,**                                          **PLAINTIFFS,**

**V.**                              **MEMORANDUM OPINION AND ORDER**

**WAL-MART STORES, INC.,**                                          **DEFENDANT.**

**\* \* \* \* \* \* \* \* \* \***

This matter is before the court on the defendant's motion for summary

judgment.  DE 16.  The court, having reviewed the record and being otherwise

sufficiently advised, will deny the motion.

**I.      Background**

This dispute arises from the decisions by three of defendant Wal-Mart's

general contractors, Cleveland Construction, Inc. ("CCI"), Weis Builders, Inc.

("Weis"), and Hudson Construction Co. ("Hudson"), to terminate subcontracting

arrangements with plaintiffs Prime Contracting, Inc. ("Prime") and Complete

Contracting, LLC ("Complete") in September and October 2005.  The plaintiffs,

providers of masonry and building erection services for the construction of both

Wal-Mart and Sam's Club stores, filed suit in Fayette Circuit Court on October 25,

2006, alleging tortious interference with contractual relationship and tortious

1

interference with prospective business relationship, after the defendant ordered its general contractors to eject the plaintiffs from any of their Wal-Mart or Sam's Club projects.  At issue are nine projects involving CCI, Weis, or Hudson as general contractors and the plaintiffs as subcontractors.  The plaintiffs in turn further subcontracted the work on each of the nine projects.

In the months preceding the defendant's ejection order, the plaintiffs experienced several incidents related to the employment or possible employment of illegal aliens on their projects.  These incidents attracted considerable media attention, with at least two of them leading to criminal prosecution against workers on the plaintiffs' projects.  These incidents generated considerable media attention and resulted in temporary shutdowns of work sites, deportations, and an investigation by Immigration and Customs Enforcement.

In March 2005, the defendant entered into a consent decree with the United States in the Western District of Pennsylvania regarding immigration violations by its cleaning contractors.  The consent decree required the defendant to provide the government all information it possessed "regarding any criminal activity, including employment of illegal aliens," to pay an $11 million fine, and to take affirmative steps to ensure compliance with federal law by its independent contractors.  The consent decree allowed the defendant eighteen months to develop implementation guidelines.

**II.     Legal Standard**

2

"Summary judgment is proper where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding the motion, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Id.* A judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Browning*, 283 F.3d at 769 (quoting *Anderson*, 477 U.S. at 252).

## III. Analysis

### A. Interference with One's "Own" Contracts: The Defendant's First Argument

The defendant first argues it is entitled to judgment as a matter of law on the plaintiffs' tortious interference with contractual relationship claim because it cannot interfere with its own contracts. To support this argument, the defendant contends that it was a party to the contracts between the general contractors and the plaintiffs because the subcontracts expressly incorporated the general contracts.

"'One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by

3

inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.'" *Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 533 (Ky. Ct. App. 2005) (emphasis removed) (citing *Restatement (Second) of Torts* § 766 (1979)).   The court finds persuasive the reasoning of *Rawlings v. Breit*, 2005 WL 1415356 (Ky. Ct. App. 2005), which held that, under Kentucky law, a tortious interference claim against the sole owner of a firm by employees does not lie because the owner "could not inferfere with his own contract."  *Id.* at *3 (citing *Rao v. Rao*, 718 F.2d 219, 225 (7th Cir. 1983)).  *See also Hodak v. Madison Capital Management, LLC*, 2007 WL 1434875, at *5 (E.D. Ky. May 14, 2007) (citing *Rawlings* for the proposition that "a party cannot interfere with a contract to which it is a party").

Under Kentucky law, the incorporation of terms from a first contract into a second can render the terms of the first contract enforceable against a party to the second contract who was not a party to the first.  In *Buck Run Baptist Church, Inc. v. Cumberland Surety Ins. Co., Inc.*, 983 S.W.2d 501 (Ky. 1998), the plaintiff was required to arbitrate with the defendant because the contract for the construction of new church buildings between the plaintiff and the general contractor contained an arbitration clause that was incorporated into the surety bond between the defendant and the general contractor.  *Id.* at 503, 505.  Because "[t]he Cumberland Surety performance bond clearly and specifically incorporated by reference the

construction contract between Buck Run and [the general contractor,] if the arbitration provisions of that contract are otherwise enforceable, they are binding on Buck Run.  Cumberland, in effect, stood in the shoes of [the general contractor] and became the contractor on the project." *Id.* at 503.  Consequently, because the "dispute involves a construction contract, and not the applicability of an insurance exemption to the statute," the Kentucky Supreme Court found that "Cumberland is entitled to enforce the construction arbitration agreement." *Id.*

*Home Lumber Co. v. Appalachian Regional Hopitals, Inc.*, 722 S.W.2d 912 (Ky. Ct. App. 1987), a case that was remanded to the trial court to resolve a question of fact, was "clearly distinguishable" because in *Buck Run* "the language of the performance bond clearly incorporates by reference the contract between Buck Run and [the general contractor]." *Buck Run*, 983 S.W.2d at 503. Nonetheless, *Home Lumber* did hold as a matter of law that "a prime construction contract which required arbitration could be incorporated by reference into a purchase order contract with a material supplier." *Buck Run*, 983 S.W.2d at 503. *See also Exchange Mutual Ins. Co. v. Haskell Co.*, 742 F.2d 274, 276 (per curiam) (6th Cir. 1984) ("[A] party does not have to be a signatory to the contract when the contract is specifically referred to and incorporated by reference in the surety bond.") (citing *J & S Construction Co. v. Travelers Indemnity Co.*, 520 F.2d 809 (1st Cir. 1975)).

The language of the prime contracts and the subcontracts in the instant case

5

clearly provides for the incorporation of the prime contracts into the subcontracts. The contracts between the defendant and the three general contractors include a provision requiring the general contractors to incorporate the general contract into any subcontracts or sub-subcontracts. *See, e.g.*, DE 16-5, at 21 (Article 20 of CCI's prime contract with Wal-Mart states that all subcontracts and sub-subcontracts shall provide that they are "subject to all of the terms and conditions of this [General] Contract, except to the extent expressly stated otherwise in the Contract Documents.").[1]  In accordance with this provision of the general contract, the subcontracts between the general contractors and the plaintiffs in this case included clear language incorporating the General Contract.[2]

Even though a "flow down" clause such as the one in the instant subcontracts may make enforceable certain provisions of the General Contract

---

[1] The defendant states that it attached only one general contract to its motion because "[t]he language in all of the general contracts is the same," a point the plaintiffs do not dispute.  DE 16-2, at 3 n.1.

[2] *See* DE 16-6, at 1 (CCI's subcontract with Prime states that "[t]he Construction Contract ('Prime Contract') is incorporated herein by reference and made a part of this Subcontract Agreement (exclusive of the provisions thereof defining C.C.I.'s Contract Price or fee)."); DE 16-7 (Weis's subcontract with Complete states that it binds subcontractors "to the Contractor by the terms of the General Contract, to conform to and so comply with the provisions of the General Contract . . . , and to assume toward the Contractor all the obligations and responsibilities that the Contractor assumes in and by the General Contract toward the Owner, insofar as they are applicable to this Subcontract."); DE 16-8, at 1 (Hudson's subcontract with Complete states that "Subcontractor shall furnish all necessary materials, labor, tools, equipment and supplies necessary to perform and to perform all work set forth [herein] . . . in accordance with the terms and provisions of the Contract between [the defendant] and [the General] Contractor . . . .")

6

against a subcontractor, it does not make the plaintiffs parties to the defendant's contracts with the general contractors.  Indeed, this clause is necessary to make provisions of a general contract, such as an arbitration clause, enforceable against a non-party to the general contract, such as a surety, precisely because the non-party is not a party to the general contract.  Therefore, the plaintiffs' claims do not accuse the defendant of "interfer[ing] with its own contracts," *Rawlings*, 2005 WL 1415356, at *3, but instead accuse it of interfering with contracts between the plaintiffs and the defendant's general contractors.  Consequently, the nature of the contracts at issue does not preclude the possiblity of the plaintiffs making out claims for tortious interference with contractual relationship, and the defendant's first argument for summary judgment fails.

      **B.**    **Tortious Interference with (Existing) Contractual Relationship**

      The defendant next argues that it is entitled to judgment as a matter of law as to the plaintiffs' claims for tortious interference with (existing) contractual relationship because the plaintiffs have not come forward with facts on which a reasonable jury could rely in finding for the plaintiffs on this claim.  Specifically, the defendant asserts that the plaintiffs cannot demonstrate there was any breach of the contracts between the general contractors and the plaintiffs and that any "interference" by the defendant was not malicious or unjustified, or was otherwise in good faith.

      A claim for tortious interference with (existing) contract requires a plaintiff to

establish six elements: "(1) the existence of a contract; (2) Defendants' knowledge of this contract; (3) that it intended to cause its breach; (4) its conduct caused the breach; (5) this breach resulted in damages to [the plaintiff]; and (6) Defendant had no privilege or justification to excuse its conduct." *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995) (citing *Carmichael-Lynn-Nolan Advertising Agency, Inc. v. Bennett & Assocs., Inc.*, 561 S.W.2d 99 (Ky. Ct. App. 1978)).  Put differently, in order to establish this tort, the plaintiff must show that the interference was "with a known contractual relationship [and] malicious or without justification, or . . . accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991) (citations omitted).  Moreover, "[a]t a minimum, [the plaintiff] must show that a contract existed between it and a third party followed by a breach by the third party." *CMI*, 918 F. Supp. at 1079 (citing *Industrial Equipment Co. v. Emerson Elec. Co.*, 554 F.2d 276, 289 (6th Cir. 1977) (applying Kentucky law)).

> 1.   *Scope of the General Contractors' Right to Terminate the Plaintiffs Without Cause*

The defendant first argues that termination of the plaintiffs by a general contractor could not result in a breach of contract regardless of the circumstances because the subcontracts allows the general contractors to terminate them without cause.[3]

---

[3] *See* DE 16-7, at 4 (The subcontract between Weis and Complete provides that "[t]he Contractor may, at any time, terminate performance (in whole or in part) under this Agreement for the Contractor's convenience and without cause."); DE

8

The plaintiffs argue that the contractual language on which the defendant relies cannot immunize the defendant from liability where the defendant's conduct resulted in the general contractors' breach of their duty of good faith and fair dealing.  Indeed, under Kentucky law, "[i]n every contract, there is an implied covenant of good faith and fair dealing" and, therefore, "it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out."  *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991) (citations omitted).

In *Stratmore v. Goodbody*, 866 F.2d 189, 190, 195 (6th Cir. 1989), the Sixth Circuit held that, under Kentucky law, a tortious interference claim against an auctioneer did not lie where the owner of a "share" in a stallion was unable to auction his breeding rights for a season (known as a "nomination") after the chairperson of the syndicate's oversight committee notified the auctioneer of a "no auction" clause in the syndication agreement and the auctioneer subsequently refused to go ahead with the auction.  The Sixth Circuit held that the contract between the auctioneer and the owner of the share to auction the horse was not

---

16-6, at 14 (The subcontract between CCI and Prime provides that "[i]f after termination, in whole or in part, it is determined, for any reason, that the Subcontractor was not in default or that the Subcontractor was not properly terminated for default, then such termination shall have been deemed to be for the Convenience of C.C.I."); DE 16-8, at 2 (The subcontract between Hudson and Complete provides that "[i]f Owner, with or without cause, shall terminate the General Contract or shall stop or suspend work under the General Contract, or if Owner shall fail to pay when due any sum payable under the General Contract, Contractor may order Subcontractor to stop or suspend work hereunder . . . .").

9

breached because it allowed the auctioneer "the right to refuse a consignment of any share or season . . . for any reason which in its sole discretion it deems appropriate." *Id.* at 195.  Crucial to this holding, however, were findings that the "no auction" clause "is a lawful means of ensuring quality mares are presented to [the stallion at issue]" and that the auctioneer's "interference was not 'without justification' or 'coercive.'" *Id.* at 195.  Therefore, contrary to the defendant's contention, *Stratmore* does not stand for the sweeping proposition that a broad grant of discretion in a contract to terminate the agreement provides immunity from tort liability for interference where a contract is terminated for any reason.  Instead, *Stratmore* requires an inquiry into whether the conduct was unjustified or coercive. *See also RAM Engineering & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 585 (Ky. 2003) (noting that a termination-for-convenience clause "cannot supersede the good faith duty to do 'everything necessary' to carry out the contract").

      2.    *Scope of the Rights of the Defendant and Its General Contractors to Terminate Plaintiffs for Violating Other Contractual Restrictions*

The defendant next argues that no breach occurred because (1) the general contractors had the right under their subcontracts with the plaintiffs to terminate them for breaching the General Contract's requirement that anyone working on a Wal-Mart site comply with the immigration laws[4] and (2) the general contractors

_____

    [4] *See* DE 16-5, at 20-21 ("Contractor hereby represents, warrants and covenants to Owner as follows: . . . (b) Contractor (i) has complied, and shall at all

10

had the right under provisions in the subcontracts to terminate subcontractors

whose workers did not comply with immigration laws.[5]   The defendant also notes

that the General Contract provides that a default under one contract entitles the

---

times during the term of this Contract comply, in all respects with all immigration laws, statutes, rules, codes, orders, and regulations, including, without limitation, the Immigration Reform and Control Act of 1986, as amended, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, and any successor statutes thereto, (ii) has properly maintained, and shall at all times during the term of this Contract properly maintain, all records required by the United States Citizenship and Immigration Services (the "USCIS"), including, without limitation, the completion and maintenance of the Form I-9 for each of Contractor's employees, and (iii) has responded, and shall at all times during the term of this Contract respond, in a timely fashion to any inspection requests related to such I-9 Forms. . . .  Owner may, in its sole discretion, terminate this Contract immediately if, at any time during the term, (x) Contractor violates or is in breach of any provision of this Section 19.1(b) or (y) USCIS determines that Contractor has not complied with any of the immigration laws, statutes, rules, codes, orders or regulations of the United States . . . .")

[5] *See* DE 16-6, at 2 (The subcontract between CCI and Prime states that "[i]t is specifically agreed and understood that all persons employed by the Subcontractor to perform work or services under this Subcontract shall be citizens, nationals or aliens authorized to work in the United States of America. Subcontractor shall bear exclusive responsibility for providing employees who are qualified under the Immigration Reform and Control Act ("ICRA") and who have completed an I-9 Form. . . .  Should subcontractor fail to comply with this provision, C.C.I. may, at its option, terminate this Subcontract for default."); DE 16-7, at 2 (The subcontract between Weis and Complete states that the plaintiffs agree "[t]o comply with all Federal and State laws, codes, and regulations, all municipal ordinances and regulations, as they apply to the work being performed under this subcontract, and all requirements of the General Contract . . . ."); DE 16-8, at 4 (The subcontract between Hudson and Complete states that "Subcontractor agrees to be bound and comply with all applicable labor laws, regulations and standards issued or promulgated by federal, state or other governmental authority having jurisdiction. . . .  Subcontractor agrees that any further subcontractor of any portion of the work covered hereby shall observe and be bound by said provisions to the same extent as herein required of Subcontractor.").

11

defendant to terminate all contracts.[6]

As with the termination-for-convenience clauses in the subcontracts, the implied duty of good faith and fair dealing must also be considered in the context of the exercise of contractual provisions requiring compliance with immigration laws. *Ranier*, 812 S.W.2d at 156.  The plaintiffs correctly point out that neither an I-9 documentation shortfall nor the mere employment of an illegal alien by itself necessarily establishes a violation of the immigration laws by an employer.  The employer may have, for example, been presented apparently valid identification that supported its conclusion a particular individual was authorized to work or committed a record-keeping error that did not rise to the level of a violation of the immigration laws.  Therefore, the exercise of provisions allowing termination for violation of immigrations laws must also be subject to an inquiry into whether the conduct of the defendant was unjustified or coercive.  *Stratmore*, 866 F.2d at 195. Accordingly, the court will next address whether a reasonable jury could conclude that the alleged interference by the defendant was malicious, unjustified, or in bad faith.

---

[6] *See* DE 16-5, at 24-25 ("The default or breach by Contractor of . . . any of the terms or conditions of, or obligations set forth in, (1) another contract or agreement with Owner, or any subsidiary, division or affiliate of Owner (collectively, the "Other Contracts") . . . that otherwise relate to . . . immigration . . . issues, shall constitute an event of default hereunder, and . . . shall constitute an event of default under the Other Contracts, and in the case of each . . . , Owner shall have the right to pursue such remedies as are provided for herein or in the Other Contracts, as applicable, or at law or in equity, concurrently, cumulatively or successively against Contractor until all damages arising by reason of such default have been paid in full.").

> 3.    *Whether Alleged Interference by the Defendant Was Malicious*
>         *or Unjustified*

The defendant argues that the mere exercise of a valid contractual right cannot be malicious or unjustified and points to the provision in its general contracts providing, "Owner shall have the right to refuse, in its sole discretion, any individual whom Contractor proposes to perform the Work under the Contract Documents."  DE 16-5, at 16.  This "sole discretion" clause, however, is subject to being exercised with justification and without malice or an improper purpose.

In the context of tortious interference claims, "[q]uestions like 'good faith,' 'improper purpose,' and 'motive' are fact questions properly decided by a jury." *Uppal v. Gateway Regional Health Sys., Inc.*, 2005 WL 2323174 (Ky. Ct. App. Sept. 23, 2005) at *5.  The plaintiffs argue that malice and lack of justification are shown because (1) the defendant's March 2005 consent decree allowed it more time (eighteen months) to bring its cleaning contractors into compliance with immigration laws and (2) its response to a 2006 incident involving illegal immigrants working on projects for the defendant was not to eject the contractor. The factors from the *Restatement (2d) Torts* § 767 (1979) cited in *Uppal*, 2005 WL 2323174, at *5, for use in "Determining Whether Interference is Improper" do not preclude the plaintiffs from pointing to other similar cases to show malice or lack of justification.

The March 2005 consent decree relates to the defendant's contracting practices with its independent contractors who provided cleaning services to the

13

defendant, but a reasonable jury could analogize the contracts between the plaintiffs and the general contractors in this case with the contracts at issue in the consent decree between the defendant and its cleaning contractors.  A reasonable jury could infer that the eighteen months allowed the defendant under the consent decree resulted from the defendant's insisting during negotiations that it could not implement the consent decree immediately.

A reasonable jury could also infer malice or lack of justification by comparing the facts of the present case with those of a similar incident that also drew media attention.  In 2006, illegal immigrants were arrested at a Wal-Mart construction site in North Dakota, and Wal-Mart's corporate representative conceded in deposition that the subcontractor in that case was not terminated.  DE 19, at 6, 10.  Therefore, the court finds that a reasonable jury could rely on evidence of different treatment by the defendant of another subcontractor under similar circumstances in finding that the defendant acted with malice or without justification in ordering its general contractors to terminate the plaintiffs.

>    4.    *Whether the Defendant's Alleged Interference Was In "Good Faith"*

The defendant asserts that, even if it interfered with the plaintiffs' contracts with the general contractors with malice or without justification, it may escape liability because its actions were taken in good faith.  *See National Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 858 (Ky. 1988) ("Even if evidence is presented which would otherwise make a submittable case, the party whose

14

interference is alleged to have been improper may escape liability by showing that he acted in good faith to assert a legally protected interest of his own.").

*Uppal* is also applicable to this argument by the defendant because, like malice and lack of justification, "good faith . . . is [a] fact question[] properly decided by a jury."  2005 WL 2323174, at *5.  The defendant argues it had "no choice" but to terminate the plaintiffs because of the series of arrests at its project sites.  Moreover, the defendant points to the $11 million fine imposed by the 2005 consent decree as further evidence it "had a legitimate business interest in making sure that anyone working on a Wal-Mart site was eligible to lawfully work in the United States."  The plaintiffs' arguments that there is a genuine issue of material fact as to whether the defendant acted with malice or without justification are equally applicable here.  While the consent decree did impose an $11 million fine, it also allowed the defendant eighteen months to address violations of the immigration laws and did not require immediate termination of its cleaning contractors.  Similarly, a reasonable jury could find that the defendant's failure under similar circumstances to terminate the subcontractor in the 2006 case from North Dakota evidences bad faith in this case.  Consequently, the defendant cannot escape liability by asserting that it acted in good faith because a reasonable jury could find that it did not do so.

Because genuine issues of material fact exist as to whether the defendant or its general contractors acted with justification, malice, or good faith in ordering its

15

general contractors to terminate the plaintiffs, the defendant is not entitled to a judgment as a matter of law as to the plaintiffs' claim for tortious interference with contractual relationship.

### C.    Tortious Interference with Prospective Business Relationship

Tortious interference with prospective business relationship has six elements: "(1) the existence of a valid business relationship or its expectancy; (2) the defendant's knowledge thereof; (3) an intentional act of interference; (4) an improper motive; (5) causation; and (6) special damages." *Monumental Life Ins. Co. v. Nationwide Retirement Solutions, Inc.*, 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003) (citing *CMI*, 918 F. Supp. at 1080). The defendant argues that the plaintiffs cannot satisfy the causation element because their complaint states that their claim for tortious interference with prospective contractual relationships are in relation to "future Wal-Mart projects," DE 1-4, at 3, and the plaintiffs admitted in deposition that they were not promised any future work by the defendant. DE 24-2, at 11.[7] The plaintiffs did not respond to the defendant's arguments as to their tortious interference with prospective business relationship claim.[8]

The defendant cites *Gray v. Central Bank & Trust Co.*, 562 S.W.2d 656 (Ky.

_____

[7] *See* DE 16-5, at 23 ("Owner has no obligation to provide any minimum amount of business to Contractor.").

[8] The defendant first argues that the plaintiffs' claim for tortious interference with prospective business relationship must fail for the same reasons as their claim for tortious interference with contractual relationship, and that argument fails for the reasons discussed above.

16

Ct. App. 1978) to support its contention that the plaintiffs have not satisfied the causation element.  In *Gray*, however, the Kentucky Court of Appeals, in discussing additional grounds that "may also have been sufficient to support the judgment" dismissing a claim for tortious interference with prospective business relationships, found that the plaintiffs "utterly failed" to satisfy the causation element because their bid had expired, their bid was not in compliance with the bidding documents, and they did not comply with a request to submit a list of subcontractors who would work on the project.  *Id.* at 659.  Moreover, crucial to the holding in *Monumental* that the plaintiff had not made out its claim was the finding that it had not "identified any evidence of a motive or intent by [the defendant] to interfere with [the plaintiff's] policies being offered as an option in its Member Plans."  242 F. Supp. 2d at 450.  In contrast, as discussed above in reference to the plaintiffs' claim for tortious interference with contractual relationship, here the plaintiffs have identified evidence that the defendant treated them differently than its cleaning contractors covered by the 2005 consent decree and the other subcontractor in North Dakota in 2006.  Therefore, a reasonable jury could find that the defendant tortiously interfered with the plaintiffs' prospective business relationship with the general contractors in this case.

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the defendant's motion for summary judgment, DE 16,

17

is **DENIED**.

Signed on  July 22, 2008

*Jennifer B. Coffman*
JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCY

18